**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                      ) | Criminal No. 07-332 (HAA) |
| ) | |
| RUSSELL CHRISTIE        ) | **OPINION AND ORDER** |
| ) | **ON PRETRIAL MOTIONS** |
| Defendant.   ) | |
| ) | |
| _____) | |

Christopher J. Christie, Esq.
United States Attorney
Lee D. Vartan, Esq.
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
970 Broad Street, Suite 700
Newark, New Jersey 07102
*Attorneys for United States of America*

Richard Coughlin, Esq.
Federal Public Defender
Lorraine Gauli-Rufo, Esq.
Assistant Federal Public Defender
John Yauch, Esq.
Assistant Federal Public Defender
OFFICE OF THE FEDERAL PUBLIC DEFENDER
972 Broad Street, Fourth Floor
Newark, New Jersey 07102
*Attorneys for Defendant*

**ACKERMAN, Senior District Judge:**

This matter comes before the Court on the pretrial motions (Doc. Nos. 39 and 47) filed by

Defendant Russell Christie, praying for various forms of relief.  In the first motion (Doc. No. 39),

filed by his counsel on his behalf, he makes four primary arguments. First, Christie seeks to

1

dismiss several Counts of the Superseding Indictment.  Second, Christie seeks to suppress both evidence seized during a search of his home, and statements allegedly made by him prior to his arrest.  Third, Christie requests a hearing to determine whether there are additional bases for suppressing evidence or dismissing Counts.  Fourth, and finally, Christie makes various discovery requests.  In the second motion (Doc. No. 47), Mr. Christie, independent of his counsel, advances several arguments regarding the warrant, the warrant affidavit, and the Superseding Indictment.

The Court has carefully reviewed the excellent briefing submitted on behalf of Christie and the Government.  In addition, the Court held oral argument on this matter on Thursday, July 24, 2008, and heard additional argumentation by counsel.  Furthermore, Mr. Christie made his own oral motions at the July 24 hearing, submitted briefing that day and subsequently, and the Court has considered those additional arguments as well.

For the following reasons, Christie's motion to dismiss Counts of the Superseding Indictment will be denied.  In addition, Christie's motion to suppress evidence will be denied, but the Court will reserve decision on the motion to suppress his statements.  The Court declines to grant Christie's request for a *Franks* hearing, and each discovery request is addressed below in appropriate detail.  Finally, Mr. Christie's independent oral motions will also be denied.


I.      **Background**

The following background information includes many facts that have been alleged, but not proven.  Accordingly, the Court provides this background summary with the strenuous caveat that Christie is innocent until proven guilty beyond a reasonable doubt, and that most of the facts

2

below are alleged, and not necessarily conceded or proven.

In November 2005, Special Agent ("SA") Douglas Macfarlane of the Federal Bureau of Investigation located in California learned that an individual named Jerrod Lochmiller wished to provide information to law enforcement through his attorney. At that time, Lochmiller was a fugitive in a federal fraud case in Los Angeles, and he also was the administrator of an Internet website designed to facilitate the exchange of videos, images, and stories, some or all of which concerned child pornography. The website, www.namgla.net (hereinafter "NAMGLA" or the "website"), was password-protected, which means that casual browsing on the Internet would not allow access to the website absent a password. NAMGLA is believed to be an acronym for "North American Man Girl Love Association."[1]

Despite the FBI's admission that Lochmiller wanted to provide information through his attorney, the FBI did not contact Lochmiller's attorney until April 2006. In the interim, starting in November 2005, SA Macfarlane logged into the NAMGLA website in an undercover capacity using a screen name and password provided by Lochmiller. At that time, SA Macfarlane learned that NAMGLA operated as a message board where users posted messages that other users could view. These messages often included links to other websites, which stored picture and video files depicting what appeared to be child pornography.

_____

[1] A July 25, 2006 press release by the FBI's Los Angeles Division notes that the NAMGLA investigation involved searches in 35 locations, including the homes and workplaces of targets in 20 states: Arizona, California, Colorado, Florida, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Texas, Washington, and Wisconsin. In addition, searches were conducted in several foreign countries: Bulgaria, Chile, Ecuador, Poland, Portugal, Spain, and Sweden. As of July 2006, two individuals were arrested as a result of the NAMGLA investigation: Russell Christie, and Thomas Herman, age 65 and a convicted sex offender in Washington State.

On one occasion in April 2006, SA Macfarlane observed a message posted by a user named "franklee,"[2] whom the Government alleges is Russell Christie.  In the message, Christie provided a link to a movie file that was nearly 19 minutes long, and included images of a prepubescent female lying nude on a bed.  An adult male hand can be seen rubbing the child's buttocks, and the camera zooms in and out of the child's genitalia.  There is also an adult female on the video, who is spreading open and posing the child's legs.  At another point in the video, an adult male's erect penis is shown rubbing against the girl's vagina until the male ejaculates onto the girl's vagina.  Later, the adult male can be seen inserting his penis into the girl's mouth before pulling out and ejaculating into her mouth.

Through its investigation, the FBI determined that the postings on NAMGLA by the user name "franklee" originated at 68A Phillips Road, Newton, New Jersey.  A hardly insignificant fact is that at the time of his arrest, Christie, age 48, was employed as a school bus driver in the Andover district in Sussex County.  The FBI learned that Russell Christie resides at both 68 and 68A Phillips Road.  Green Valley Beach Campground is also located at 68 Phillips Road, and is owned by Janet Christie, Russell's mother.  The importance of the distinction between 68 and 68A will become obvious later, but suffice to say at this point that the FBI acquired information that placed Russell Christie at both addresses, which were allegedly indistinguishable from the outside.

Ultimately, the FBI determined that Christie resided at 68 Phillips Road, not 68A, and thus the agents applied for a search warrant for that address.  On July 24, 2006, Magistrate Judge

---

[2] Apparently, Christie used the name of a former boss, Frank Lee, whom Christie disliked.

Patty Shwartz signed the search warrant, and agents executed it the following morning at about 6:00 AM. Within twenty minutes, the agents determined that Christie resided at 68A, not 68, and so they immediately exited the dwelling, contacted the U.S. Attorney's Office in Newark, and ultimately decided to apply for a search warrant for 68A Phillips Road. An agent was dispatched back to Newark to draft and obtain the new affidavit, and thereafter it was presented to Magistrate Judge Shwartz for review and consideration.

While the one agent was away to acquire the new search warrant, other agents remained outside the 68 Phillips Road address, after having secured and cleared the dwelling. The agents informed Christie and his mother that neither of them could enter the 68A address unaccompanied by agents, but that they were not under arrest, and neither were they under any obligation to remain with the agents outside the apartment. As a result, Christie's mother went about her day, but Christie apparently stayed with the agents and made several statements.

At approximately 1:15 PM, Magistrate Judge Shwartz signed the new search warrant for 68A, the agent returned to the address at about 2:00 PM, and the search of the apartment began. The agents seized a computer containing approximately 567 postings to NAMGLA, hundreds of videos of alleged child pornography, and thousands of images of alleged child pornography. At about 6:00 PM, the agents arrested Christie. On July 26, 2006, the Government charged Christie in a criminal Complaint alleging that Christie possessed child pornography. On April 20, 2007, a Grand Jury returned a two-count Indictment charging Christie with one count of receiving and distributing child pornography, and one count of possessing child pornography.

Subsequently, on October 19, 2007, the Grand Jury returned this eight-count Superseding Indictment charging Christie with six counts of advertising and attempted advertising of child

pornography, in violation of 18 U.S.C. § 2251(d)(1)(A), one count of receipt and attempted

receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1), and one count

of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

The current motion by Christie involves multiple issues.  First, Christie moves to dismiss

Counts 2 through 6 (the advertising counts) as multiplicious of Count 1, which also charges

advertising.  Second, Christie moves to dismiss Counts 1 through 3 on the ground that they fail to

allege "notice" as required by the statute.  Third, Christie moves to suppress certain evidence

seized at his home on the grounds that the affidavit used to acquire the search warrant was

materially misleading, and also on the grounds that there was an unlawful execution of the search

warrant.  Fourth, Christie moves to suppress alleged statements made by him to law enforcement

during the seven hours between the time when the one agent left to obtain a new warrant, and the

return of that agent and execution of the new warrant.  Fifth, Christie makes certain discovery

requests for disclosure of: *Brady* material; Rule 404(b) evidence; tests, reports, and summaries by

the Government's experts; and Jencks Act material.  Sixth, and finally, Mr. Christie makes

several motions regarding the warrant affidavit, namely that it was stale, overbroad, vague, and

lacking in particularity.  The Court will address these issues seriatim.


## II.     Motions to Dismiss

### A.     Counts 2 through 6 are not multiplicious of Count 1.

The Superseding Indictment sets forth, in its first nine paragraphs, the basic facts about

NAMGLA and Christie's connection to the website through the user name "franklee."  In the

ninth paragraph, the Superseding Indictment charges that Christie

> did knowingly make, print, and publish . . . a notice and
> advertisement seeking and offering to receive . . . visual depictions .
> . . of a minor engaging in sexually explicit conduct, and the defendant
> knowing . . . that such notice and advertisement would be transported
> across state lines by any means, including by computer, specifically
> the NAMGLA Website; and such notice and advertisement was
> transported across state lines . . . , each [notice and advertisement]
> constituting a separate Count of this Superseding Indictment.

(Superseding Indictment at ¶ 9.)  The Superseding Indictment then lists each of six posts to

NAMGLA allegedly made by Christie, the date of each post, and a brief description of the

contents of the link included in each post.  Each post constitutes a separate Count of the

Superseding Indictment, and each Count constitutes a violation of 18 U.S.C. § 2251(d)(1)(A).[3]

Christie argues that only one of the first six counts is necessary because there is arguably

only one criminal act.  In other words, Christie contends that the Government "has divided what

is a single alleged act of advertising child pornography into several criminal charges."  (Christie

Br. at 6.)  Christie insists that doing such is a violation of the Double Jeopardy Clause of the

Fifth Amendment, and he points to the Third Circuit's decision in *United States v. Carter*, 576

F.2d 1061, 1064 (3d Cir. 1978) as support.

"Multiplicity [is] the charging of a single offense in different counts of an indictment."

*Carter*, 576 F.2d at 1064.  "The basic inquiry in determining whether counts of an indictment are

truly separate, and not multiplicious,[4] is whether proof of one offense charged requires an

---

[3] The posts occurred between October 2005 and January 2006: Count 1 (October 8,
2005); Count 2 (November 19, 2005); Count 3 (November 21, 2005); Count 4 (November 27,
2005); Count 5 (January 25, 2006); and Count 6 (also January 25, 2006).

[4] Understandably, the parties have struggled with the unusual language used to describe
whether a single crime has been inappropriately charged in multiple counts.  In referencing
*Carter*, Christie used the term "multiplicitious," which is not a word and includes two additional
letters.  Similarly, the Government quoted the case, but provided "sic" after *Carter*'s use of the

additional fact that proof of the other offense does not necessitate." *Id.* "Also of central

importance is whether the legislature intended to make separately punishable the different types

of conduct referred to in the various counts." *Id.*; *see also United States v. Stanfa*, 685 F.2d 85,

87 (3d Cir. 1982) ("In practice . . . we have usually found the second *Carter* inquiry

[congressional intent] to be determinative of the multiplicity question."). In *Carter*, the

defendant was charged with two counts: (1) possession with intent to distribute 95 grams of

heroin; and (2) distribution of 677 grams of heroin. The defendant argued that he should only

have been charged with one count because he brought all of the heroin from Los Angeles to

Newark, and thereafter turned it over to his co-conspirator, who set aside 95 grams for himself,

and attempted to sell the 677 grams to undercover officers. The Third Circuit rejected the

defendant's argument, holding that Congress intended two distinct offenses, punishable by

---

term "multiplicious," obviously believing that the Third Circuit had erred. At other points in his
brief, Christie correctly uses the Third Circuit's language of "multiplicity," but the Government
appears to believe that the proper term is "multiplicitous." (*See* Govt. Br. at 11.)

   Contrary to the parties' apparent understanding, "multiplicious" is in fact a word, albeit a
somewhat arcane one. *See* Webster's Revised Unabridged Dictionary (1913 ed.).
"Multiplicious" is simply defined as "manifold," which as an adjective is more broadly
understood as "many or varied." Additionally, more than a few courts have used "multiplicious"
in the same context addressed in the present motion. *See, e.g., United States v. Serino*, 835 F.2d
924, 930 (1st Cir. 1987); *United States v. Skinner*, 946 F.2d 176, 178 (2d Cir. 1991); *United
States v. Stanfa*, 685 F.2d 85, 87, 88, 89 (3d Cir. 1982); *United States v. Buchanan*, 485 F.3d
274, 278 (5th Cir. 2007); *United States v. Adesida*, 129 F.3d 846, 851 n.5 (6th Cir. 1997); *United
States v. Marren*, 890 F.2d 924, 932 (7th Cir. 1989); *United States v. Wilkinson*, 124 F.3d 971,
975 (8th Cir. 1997); *United States v. Zalapa*, 509 F.3d 1060, 1063 (9th Cir. 2007); *United States
v. Reitmeyer*, 356 F.3d 1313, 1320 (10th Cir. 2004); *United States v. Wilson*, 983 F.2d 221, 223
(11th Cir. 1993); *but see United States v. Goodine*, 400 F.3d 202, 207 n.6 (4th Cir. 2005)
(observing that "[v]arious courts, including [the Fourth Circuit], have spelled multiplicity in its
adjective form as 'multiplicious' and 'multiplicitous.' 'Multiplicitous' is apparently the preferred
spelling of the term, and 'multiplicious' may be considered obsolete") (citing Bryan A. Garner, A
Modern Dictionary of Legal Usage 576-77 (2d ed.1995)).

separate sentences, because the acts of possession and distribution involved discrete quantities of narcotics, and thus the facts required to prove the two offenses differed. *Id*.

Carter is not a perfect analogy because it involves the question of whether possession with intent to distribute and distribution are duplicative, not whether multiple instances of distribution are multiplicious, but the case is nevertheless instructive. Indeed, *Carter* teaches that of "central importance is whether the legislature intended to make separately punishable the different types of conduct referred to in the various counts." *Carter*, 576 F.2d at 1064. Here, § 2251(d)(1)(A) provides punishment for anyone who "knowingly . . . publishes . . . any notice or advertisement seeking or offering . . . to distribute . . . any visual depiction . . . [that] involves the use of a minor engaging in sexually explicit conduct." Thus, the actus reus that the legislature intended to punish is the *publication* of a notice or advertisement regarding child pornography. The Superseding Indictment charges that Christie did so publish a notice or advertisement on six occasions on five different days between October 2005 and January 2006. It is sensible to punish each publication separately because it is the advertisement that invites the metastasizing of child pornography in our society. By further crude analogy, attempts at prohibiting the oldest profession demonstrate that prohibiting prostitutes from "advertising" their wares on the street corner can have a dramatic effect on the quantity of business transacted. Likewise here, Congress intended to punish the knowing publication of an advertisement that contributes to the proliferation of child pornography. Accordingly, each individual post to a website can be the basis for a separate charge because each post is intended to increase the quantity and availability of child pornography.

The Third Circuit has not addressed this precise issue, but this Court's conclusion in this

regard is buttressed by cases from other circuits.  For example, in *United States v. Planck*, 493 F.3d 501 (5th Cir. 2007), law enforcement searched the defendant's home and found "a desktop computer, laptop computer, and 223 computer diskettes . . . . The desktop computer contained 88 videos and still child-pornography photographs; the laptop computer, four still photographs; and the diskettes, thousands of images.  In total, [the defendant's] computer data contained approximately 5,000 child-pornography images."  *Id.* at 502.  The defendant was subsequently charged with three counts of possession of child pornography.  Consequently, the defendant "moved to dismiss two of the possession counts on multiplicity grounds, contending he was being prosecuted three times for the same possession-of-child-pornography act."  *Id.*  The Fifth Circuit rejected the defendant's multiplicity argument, holding that "[f]or the possession statute . . . , the *actus reus* is the possession of child pornography . . . . Through different transactions, [the defendant] possessed child pornography in three separate places-a laptop and desktop computer and diskettes-and, therefore, committed three separate crimes.  The counts are not multiplicitous."  *Id.*  In reaching its holding, the *Planck* court analogized to receipt/distribution statutes addressing child pornography.  The court explained that in those circumstances, "each separate receipt of child pornography violates the statute" and "each separate use of the mail to transport or ship child pornography should constitute a separate crime."  *Id.* (citing *United States v. Buchanan*, 485 F.3d 274, 279-82 (5th Cir. 2007); *United States v. Gallardo*, 915 F.2d 149, 151 (5th Cir. 1990)).

Similar to the defendant in *Planck*, Christie is charged with advertising child pornography on six separate occasions.  Each of Counts 1 through 6 charge that Christie advertised five different videos and one series of images in six discrete postings spread across four months.

10

Christie provides no logical basis upon which to conclude that any posting could be considered duplicative of any other posting, much less that Counts 2 through 6 constitute a multiplicious charge of Count 1.

Christie's argument that he should only be charged once for advertising because he was only charged once for possession of thousands of images of child pornography is unpersuasive. The possession statute prohibits the possession of "any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography." 18 U.S.C. § 2252A(a)(5)(B). In other words, it is illegal to possess an *object* containing an image of child pornography, regardless of how many images are contained within that object. As *Planck* held, one can be separately charged for the possession of each object–book, magazine, computer disk–that contains even one image of child pornography, but if that object contains thousands of images, a defendant can still be charged with only one count of violating the statute.[5]  By contrast, the advertising statute makes it illegal to commit the act of advertising, regardless of how many images are included in each advertisement. Accordingly, each act of advertising can result in a separate charge.

---

[5] The number of images typically affects the advisory Sentencing Guidelines calculation, but the number of images does not result in separate counts. For example, Section 2G2.2(b)(7) provides for sentencing enhancements depending on the number of images involved in the specific offense. In particular, subsection (A) provides for a two-level enhancement "if the offense involved . . . at least 10 images, but fewer than 150." Subsection (B) provides for a three-level enhancement "if the offense involved . . . at least 150 images, but fewer than 300." Subsection (C) provides for a four-level enhancement "if the offense involved . . . at least 300 images, but fewer than 600." Finally, subsection (D) provides for a five-level enhancement "if the offense involved . . . 600 or more images." U.S.S.G. § 2G2.2(b)(7); *see also* Application Note 4(b)(ii) ("Each video, video-clip, movie, or similar recording shall be considered to have 75 images. If the length of the recording is substantially more than 5 minutes, an upward departure may be warranted.").

This holding is supported by Third Circuit caselaw.  In *United States v. Villard*, 885 F.2d 117 (3d Cir. 1989), our Court of Appeals rejected the defendant's argument that he could not be charged for both sending child pornography through the mails and for carrying those same materials across state lines.  *Id.* at 121 n.5.  The *Villard* court found that the defendant could be charged separately "because the government must prove different facts in order to achieve convictions in each of [the separate counts]."  *Id.*  Similarly, here the Government must prove different facts for each of Counts 1 through 6, namely that Christie made each post and that each post contained a notice and advertisement of child pornography.  For the foregoing reasons, Christie's motion to dismiss Counts 2 through 6 as multiplicious will be denied.

**B.      The Government sufficiently alleged "notice" as to Counts 1 through 3.**

In a single paragraph, Christie contends that the Government failed to plead an essential element of the offense in Counts 1 through 3.  Those Counts reference postings allegedly made by Christie, each of which simply contain a link to a video, without any description of what the link or corresponding video contains.  These Counts differ from Counts 4 through 6, each of which contains a description of the contents of the video of alleged child pornography.  Accordingly, Christie contends that "nowhere in [Counts 1 through 3] is there a notice, advertisement or any indication whatsoever, of what the link contains."  (Christie Br. at 7.)  In other words, Christie argues that the posts containing only links do not satisfy the notice or advertisement requirement of 18 U.S.C. § 2251(d)(1)(A).  Christie then declares that the "Third Circuit has not addressed this specific issue."  (*Id.*)

Christie's argument is unpersuasive.  To adopt his interpretation of what notice and

advertisement means in the statute would be to hold that the statute cannot reach an individual

who disseminates child pornography without a written description of the contents of that child

pornography.  Such an interpretation would carve a hole in the statute big enough to render the

statute non-existent because purveyors of child pornography would quickly learn that they can

operate with impunity so long as they do not provide words to accompany their illegal pictures.

That would completely negate the primary intent of Congress: to eliminate the exchange of child

pornography.

   While it is true that the Third Circuit has not addressed the question of what constitutes

"notice and advertisement," the Government points to a Second Circuit case to counter Christie's

argument.  In *United States v. Rowe*, 414 F.3d 271 (2d Cir. 2005), the court of appeals addressed

a situation in which the defendant had posted, in an Internet chat room, the following: "[v2.3b]

Fserve Trigger: !tun Ratio 1:1 Offering: Pre boys/girl pics. Read the rules. [1 of 2 slots in use]."

*Id*. at 273.  This seemingly incomprehensible jargon was understood by users of the chat room

"preteen00" to be information on how to access the defendant's home computer, download, and

upload photographs of underage children.  *See id*.  The defendant later argued that this post was

beyond the scope of the advertising statute because it "does not by its very terms indicate it is

seeking or offering material of a pornographic nature."  *Id*. at 276.  The *Rowe* court rejected that

argument, explaining that "there is no requirement that an advertisement must specifically state

that it offers or seeks a visual depiction to violate [the statute]."  *Id*. at 277 (quoting *United States

v. Pabon-Cruz*, 255 F. Supp. 2d 200, 218 (S.D.N.Y. 2003)) (quotation marks omitted).  Indeed,

the court further noted that "no particular magic words or phrases need to be included" to satisfy

the notice and advertisement requirement of the statute.  *See id*.  Importantly, the *Rowe* court

found it significant that the chat room contained queries such as "anybody with baby sex pics for trade?," and the court noted that offering pictures of children in a chat room containing such queries or comments was sufficient to constitute notice and advertisement within the meaning of the statute.  *Id*. at 276.  In other words, the court deemed context important in answering the question of whether a facially vague post constitutes notice and advertisement.

Here, the NAMGLA website was primarily dedicated to the exchange of alleged child pornography.  Thus, a user of the password-protected website could reasonably understand that a post containing a link would not lead the user to pictures of unicorns and butterflies, but instead would yield images or video of children in a sexually explicit manner.  But it is actually irrelevant whether an individual would accurately predict that a given link posted on the Internet would yield child pornography.  The question is whether the posting of the link itself constitutes a notice and advertisement.  In that regard, *Rowe* is instructive inasmuch as it held that the purported advertisement need not expressly declare, "I have child-pornographic images for trade."  *Rowe*, 414 F.3d at 277.  Indeed, "Congress did not intend its bar on advertising for child pornography to be so easily evaded."  *Id*.  A notice and advertisement need not be explicit itself, for to hold such would be to encourage the proliferation of child pornography so long as it is done in a "subtle" manner by merely posting on a password-protected website dedicated to child pornography a direct link to a prohibited video.  Accordingly, this Court holds that a non-descriptive link to an image or video of child pornography satisfies the notice and advertisement element of 18 U.S.C. § 2251.  In that regard, Christie's motion to dismiss Counts 1 through 3 will be denied.

III.     **Motions to Suppress Evidence**

A.     **The warrantless seizure of Christie's home pending the supplemental search warrant was not unreasonable.**

Christie next moves to suppress the evidence seized at his home on the grounds that the seizure of his home was unreasonable and therefore in violation of the Fourth Amendment.[6]  As previously mentioned, law enforcement officers executed a search warrant for 68 Phillips Road, but quickly realized that Christie resided at 68A, an attached apartment to 68.  Realizing this, the officers exited 68 and dispatched an agent back to Newark to obtain a new warrant for 68A.  While the agent was obtaining the new warrant, other agents stayed at the scene and informed Christie that was he not permitted to go back into his apartment at 68A unaccompanied by law enforcement, but that he was free to go anywhere else.  The agent designated to obtain the new search warrant returned approximately seven hours later.  Christie contends that the seven-hour seizure of his home was unreasonable because the officers did not act diligently in obtaining a search warrant.

In *Illinois v. McArthur*, 531 U.S. 326 (2001), the Supreme Court addressed a situation similar to this case.  There, police officers accompanied a wife to her marital home, where her husband was present, so that she could remove her belongings in peace.  As she left the dwelling, she told the officers that her husband had drugs in the house.  The officers asked the husband if they could search his home, but the husband declined them entry.  The officers then dispatched another officer to obtain a search warrant.  During the interim, the officers told the husband that

------

[6] The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.

he was not permitted to re-enter the home without being accompanied by an officer.  After about two hours, the officer returned with a search warrant, and the officers found drugs.  The husband was arrested, charged and later convicted.

The defendant in *McArthur* argued that the warrantless seizure of his home while the officers obtained a search warrant was an unreasonable seizure in violation of the Fourth Amendment.  The Supreme Court began with the text of the Fourth Amendment, noted that the Court has often required a warrant for seizures, but then noted that there are exceptions to the warrant requirement, namely exigent circumstances.  The *McArthur* Court ultimately held that exigent circumstances justified the warrantless seizure of the defendant's home, especially in light of the appropriately balanced privacy-related and law enforcement-related concerns.  The Court based its holding on the combination of four circumstances: (1) probable cause to believe the defendant's home contained evidence of a crime or contraband; (2) good reason to believe that the defendant, unless restrained, would destroy the evidence; (3) reasonable efforts to reconcile law enforcement needs with the demands of personal privacy; and (4) limited period of time for the restraint's imposition.  *Id*. at 331-32.

Here, Christie concedes that the Government had probable cause to believe he had evidence of a crime or contraband.  He also concedes that the Government had good reason to believe that he would destroy evidence if he had not been restrained.  And Christie concedes that the Government took reasonable efforts to reconcile the need to prevent evidence destruction with the demands of Christie's personal privacy.  In other words, Christie concedes that the Government satisfies the *McArthur* test on the first three of four factors.  It is the fourth factor–limited period of time–that Christie insists is not met in his case.  That is, Christie argues

that the officers "did not exercise diligence in obtaining a search warrant for the premises." (Christie Br. at 11.)  Christie points to *McArthur*, which found that the two-hour warrantless seizure was reasonable, to support his argument "that a time period longer than 'reasonably necessary' to obtain a warrant would make the temporary seizure unreasonable and therefore unlawful under the Fourth Amendment."  (Christie Br. at 11.)  Christie's somewhat circular argument is no doubt true: It is unreasonable for a seizure to last longer than is reasonably necessary.  But that simply begs the question of what is reasonable.

In that regard, Christie contends that the seven to eight hours that were spent waiting for the FBI to return with a new search warrant "was clearly unnecessary and should be deemed unreasonable."  (*Id*. at 12.)  Christie then observes that the drive between Newark and Newton should take "just under an hour," and thus "it remains a mystery as to why the FBI did not return until 2:00 p.m."  (*Id*.)  Christie concludes by arguing that "[e]ither it reasonably and legitimately took more than five hours to prepare and obtain the supplemental warrant, or the FBI was not diligent in so obtaining the affidavit."  (*Id*.)  Thus, it appears that Christie concedes that all but about five hours of the warrantless seizure were reasonably necessary.  Even then, Christie appears to implicitly acknowledge that the FBI could "reasonably and legitimately" take five hours to obtain a supplemental warrant.  The question then is whether the officers did in fact act diligently.

The Government argues that "the several hours it took agents to secure a search warrant for 68A Phillips Road is explained by the warrant process, which is circumspect by design." (Gov't Br. at 9.)  Specifically, the Government explains that it "had to dispatch an FBI agent to Newark during [morning] rush hour, draft the application, search warrant, and attendant

17

documents, present those documents to Judge Shwartz for consideration, have the judge review and comment upon those documents, and make any changes requested by the judge."  (*Id.*)  In other words, the Government contends that "[e]ven with diligence, it was a lengthy process."  (*Id.*)

In support of its argument that the officers acted with diligence, the Government points to a couple of cases.  Most persuasively for the Government's argument, the district court in *United States v. Nguyen*, No. 07-10050, 2008 WL 346114 (D. Mass. Feb. 7, 2008) denied the defendant's motion to suppress evidence seized after a warrantless seizure of his residence for a little more than seven hours pending the receipt of a search warrant.  *Id.* at *3.  The facts of *Nguyen* remarkably parallel the facts in this case.  For example, there the officers restricted the defendant and other occupants of the house from entering the house without a police escort.  In addition, the length of the warrantless seizure was almost exactly the same as the length in this case: seven hours.

Similarly, in *United States v. Legette*, 260 F. App'x 247 (11th Cir. 2008), the court of appeals upheld a district court's denial of a motion to suppress where officers detained an individual in his house for three to four hours pending a search warrant.  In addition, *McArthur* itself relied on *Segura v. United States*, 468 U.S. 796 (1984), which found that the Fourth Amendment was not violated where officers unlawfully entered an apartment and occupied it for 19 hours while waiting for a search warrant that could not be obtained until the next day.  *Id.* at 798 ("Specifically, we hold that where officers, having probable cause, . . . arrest the occupants . . . and take them into custody and, for no more than the period here involved, [19 hours], secure the premises from within to preserve the status quo while others, in good faith, are in the process

18

of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures."); *see also United States v. Van Leeuwen*, 397 U.S. 249, 253 (1970) (cited favorably in *McArthur* for its holding that a 29-hour detention of a mailed package was reasonable given the unavoidable delay in obtaining a warrant).[7]

At bottom, this Court concludes that the agents in this case had probable cause to believe that Christie's home contained contraband, which was evidence of a crime. They reasonably believed that Christie, if left free of any restraint, would destroy that evidence. They imposed a restraint that was both limited and reasonably tailored to secure law enforcement needs while protecting privacy interests. And the agents acted diligently in obtaining the supplemental search warrant in as timely a manner as reasonably possible. Accordingly, the restraint met the demands of the Fourth Amendment, and Christie's motion to suppress the evidence seized will be denied. *See McArthur*, 531 U.S. at 337.

### B.      Decision is reserved as to the suppression of any statements made by Christie.

Christie also moves to suppress "any statements or recordings taken without the presence of an attorney and without first informing Mr. Christie of his rights." (Christie Br. at 21.) But

_____

[7] There is no case on point in the Third Circuit for guidance on this issue in light of *McArthur*. The only Third Circuit decision that could even conceivably work in Christie's favor is *Leveto v. Lapina*, 258 F.3d 156 (3d Cir. 2001), where our Court of Appeals concluded, in a *Bivens* action, that a woman was unconstitutionally detained for six hours pending a search of her home. But there, aside from the fact that it was a seizure of a person, rather than property, the *Leveto* court noted that the officers had no probable cause to detain her in the first place. Thus, *Leveto* stands in stark contrast to this case where the officers had probable cause to search Christie's home, and they did not unlawfully arrest Christie, but instead tailored the restriction on Christie's movement to the needs of the agents to preserve the evidence in the home.

Christie has not identified any particular statement that meets either of these criteria.  Moreover, mere lack of an attorney's presence or lack of informing Christie of his rights does not, by itself, require suppression of such statements.  Indeed, as Christie hints, the appropriate question is one of voluntariness.  As the Supreme Court held in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), "the test of voluntariness [asks whether] the confession [is] the product of an essentially free and unconstrained choice by its maker."  *Id*. at 225.  If yes, then "it may be used against him," but "if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."  *Id*. at 225-26; *see also United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) ("Statements made to a law enforcement officer are inadmissable into evidence if the statements are 'involuntary.'") (citing *Bustamonte*).  This Court is well aware of the voluntariness test, and will apply it to any challenged statement at the appropriate time.  But because there is no specific statement challenged at this point, the Court will defer decision until such challenge with some degree of specificity is made.  Indeed, Christie's counsel informed the Court at oral argument that the defense was in receipt of a letter from the Government setting forth a number of statements allegedly made by Mr. Christie.  (*See* Tr. 24:7-16.)  Despite the disclosure by the Government, Christie has not attempted to argue that he was in custody and had not received his *Miranda* warnings, nor has he argued that his will was overborne by the agents on his porch.  To the extent that Christie desires a hearing to address each of the statements, the Court concludes that such a separate hearing is unnecessary.  Instead, the Court will, at trial, address any objection to a proposed statement being offered by the Government by requesting a proffer, hearing arguments from all parties, and then ruling on the admissibility of the statement.

20

IV.     **Requests for a hearing**

      A.      **A *Franks* hearing is not mandated in this case.**

In addition to the foregoing motions to dismiss the Superseding Indictment, and suppress evidence, Christie also requests a hearing, in accordance with *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the evidence should be suppressed for various alleged errors on the part of the Government.  The Court will address each issue in turn.

Christie contends that the affidavit submitted by the FBI agent to obtain the search warrant "was prepared in a deliberately misleading manner," and therefore a "*Franks* hearing is necessary to determine whether the statements in the Affidavit were either recklessly or intentionally untruthful or misleading [such that] the seized evidence in this case needs to be suppressed."  (Christie Br. at 9.)  In *Franks*, the Supreme Court announced a new rule and rejected the decisions of the courts below that held that a defendant may *never* challenge the veracity of an affidavit used to obtain a warrant.  In rejecting such a categorical ban on the challenge to an affidavit, the *Franks* Court declared that "the rule announced today has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded."  *Franks*, 438 U.S. at 167.  Indeed, the Supreme Court took great pains to identify just how limited is the scope of the rule allowing a hearing:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the

> warrant affidavit that is claimed to be false; and they should be
> accompanied by a statement of supporting reasons. Affidavits or
> sworn or otherwise reliable statements of witnesses should be
> furnished, or their absence satisfactorily explained. Allegations of
> negligence or innocent mistake are insufficient. . . . Finally, if these
> requirements are met, and if, when material that is the subject of the
> alleged falsity or reckless disregard is set to one side, there remains
> sufficient content in the warrant affidavit to support a finding of
> probable cause, no hearing is required.

*Id*. at 171-72. The lengthy quotation above can be summarized in a few points. First, the

affidavit used to obtain a search warrant is presumed valid. Second, a defendant must allege

deliberate falsehood or reckless disregard for the truth. Third, there must be an offer of proof to

support such allegations, and an affidavit should accompany it. Fourth, and finally, even if all of

the above are met, a hearing may be denied if there remains sufficient content in the warrant

affidavit to support a finding of probable cause. *See id*.

As previously mentioned, Christie seeks a hearing "to determine whether the statements

in the Affidavit were either recklessly or intentionally untruthful or misleading." (Christie Br. at

9.) But that is precisely what Christie must allege, with sufficient supporting affidavits or other

proof, to even get to a hearing. Instead, Christie seeks a hearing based upon an allegedly

misleading omission. *See Sherwood v. Mulvihill*, 113 F.3d 396, 400 (3d Cir. 1997) (declining a

mechanistic application of *Franks*, and instead holding that "a court, when confronted with a

false affidavit used to obtain a search warrant, must remove a falsehood created by an *omission*

by supplying the *omitted* information to the original affidavit") (emphases added) (citing *United

States v. Ippolito*, 774 F.2d 1482, 1486-87 n.1 (9th Cir.1985)). Nevertheless, Christie fails to

allege a material omission amounting to a deliberate falsehood. On the contrary, Christie merely

maligns the fact that "while the Affidavit is careful to state that SA Macfarlane accessed the

website in the six-month period preceding the FBI's contact with Mr. Lochmiller's lawyer, it does so almost in passing." (Christie Br. at 8.) Thus, there is no allegation of an omission because Christie acknowledges that the FBI included in the affidavit the fact that it accessed the website prior to contacting Lochmiller's attorney. Such is hardly sufficient to come within the narrow scope of *Franks* such that a hearing is mandated here. Indeed, a *Franks* hearing is not mandated simply because the defendant would prefer certain facts to have greater prominence in the warrant affidavit.

Later, Christie argues that the "passing" reference was deliberately placed out of chronological order for sinister reasons: "The placement of the paragraph detailing the FBI agent's meeting with Mr. Lochmiller's attorney first, and then slipping in the next paragraph that SA Macfarlane had logged onto NAMGLA well before that meeting, creates the impression that the FBI's monitoring of the site began only after the meeting with Mr. Lochmiller's attorney." (Christie Br. at 8-9.) But Christie then acknowledges that the facts become clear, but "[o]nly after carefully scrutinizing the Affidavit."[8] (*Id*. at 9.) In other words, Christie argues that he is entitled to a *Franks* hearing because the affidavit, "although accurate, [had a] paragraph structure [that] was not to [Christie's] liking." (*See* Gov't Br. at 6.) But Christie points to no case concluding that a hearing is required simply because an affidavit's events fail to follow a strict chronology.

Christie is apparently even more concerned with the lack of detail regarding the "nature and scope of SA Macfarlane's contact or involvement with, or direction of, Mr. Lochmiller in

---

[8] This argument also seems to implicitly suggest that Magistrate Judge Shwartz did not carefully scrutinize the affidavit prior to issuing the warrant, a suggestion this Court declines to entertain without more substance.

that initial six-month period." (Christie Br. at 8.) Christie's concern stems from a belief that NAMGLA's start date "nearly coincides" with Lochmiller's contact with the FBI, such that "the timing raises serious questions about how the activities of SA Macfarlane were portrayed to [Magistrate Judge Shwartz]." (*Id.*) Similarly, Christie speculates that the Government's close relationship with Lochmiller also "raises questions about whether his activity violated the Electronic Wiretapping and Surveillance Act." (*Id.*) Again, a *Franks* hearing is not required simply because a defendant has suspicions about the Government's activities in investigating him. *See Franks*, 438 U.S. at 171 (holding that a hearing is not mandated where the defendant has a "mere desire to cross-examine"). Were a criminal defendant's conjecture that the Government is "out to get him" sufficient to mandate a *Franks* hearing, the rule announced in *Franks* would cease to have the "limited scope" expressly intended by the Supreme Court.

Furthermore, Christie's argument that "it is possible that SA Macfarlane was utilizing Mr. Lochmiller's monitoring equipment" is insufficient to mandate a *Franks* hearing. Christie suggests that SA Macfarlane might have viewed the private messages of Christie without having first obtained a judicial order authorizing the interception of an electronic communication, pursuant to 18 U.S.C. § 2518. But Christie is forced to acknowledge that the affidavit submitted by SA Jacqueline Cristiano of the FBI in Newark expressly declares that she did not review any of the private messages captured by Lochmiller "nor has any of their content been used or relied upon for any part of this affidavit." (Christie Br. at 9 (quoting Aff. at 9 n.2).) Thus, Christie is left to speculate that another agent of the Government *might* have violated § 2518. (*See* Tr. 7:21-25 ("[W]e have grave concerns [that] there was a *potential* that the FBI were monitoring personal communications on this NAMGLA website without the authorized warrant that is necessary.");

24

*see id.* at 8:11-14 ("[T]here is a really real *possibility* that the agents *may* have been viewing communications on a computer without the proper wiretape warrant that is required.").  This is plainly insufficient to mandate a *Franks* hearing.

Regardless, as the Government persuasively argues, even if the warrant affidavit was lacking in some facts, the warrant was still supported by probable cause.  In other words, even if the affidavit were drafted the way Christie seems to propose, including the alleged omission that the Government illegally viewed private communications, there were sufficient facts attested to that would permit a probable cause finding.  Even if the FBI had a heavy hand in directing the rules of the NAMGLA website, "it would remain unchanged that Russell Christie posted child pornography from IP addresses tied to his home computer."  (*See* Gov't Br. at 7.)  Indeed, as the Government pointed out at oral argument, the twenty-six page warrant affidavit explains that the FBI "saw in the *public* posting section of the NAMGLA [website], not the private posting section, but the public posting section, there were two images and videos posted by Russell Christie."  (Tr. 13:9-11.)  While any improper activity by the FBI might be the basis for an entrapment defense, that potential affirmative defense does not change the fact that Christie made such postings from his computer in New Jersey, which is sufficient on its face for a finding of probable cause to issue a warrant.

Finally, Christie also requests a *Franks* hearing on the grounds that the FBI "acted with reckless disregard on their execution of the search warrant" because they had received information from various sources stating that Christie resided at 68A Phillips Road, instead of 68, the address for which the FBI sought the initial search warrant.  But the *Franks* Court expressly declared that a hearing is not mandated where the defendant makes allegations of

"negligence or innocent mistake." *Franks*, 438 U.S. at 171. There is nothing to suggest that the agents committed an offense any greater than innocent mistake. Indeed, they obviously wanted to search Christie's residence, so it remains a mystery why Christie believes that the agents acted with "reckless disregard" by mistakenly requesting to search his mother's house. In that regard, if Christie is asserting that the agents should not have sought to search his mother's house, he lacks standing.

If, however, he is arguing that the agents acted with reckless disregard because they had information that he lived at 68A, that argument is unavailing because the agents also had information that he lived at 68. For example, the FBI checked the public database AutoTrack, which indicated that Christie resided at both 68 and 68A Phillips Road. (Aff. at ¶ 28.) In addition, a telephone number subscribed to by Christie had a billing address of 68. While it is true that the FBI had more indications that Christie lived at 68A than 68, the warrant affidavit declares that the "FBI agents could locate no structure with the number '68A' affixed to it. . . . Accordingly, agents believe that '68A' is an alternative mailing address employed by Russell Christie." (*Id.* at ¶ 34.) Christie's submission to this Court of a photograph of a door with "68A" in letters no more than two inches tall simply suggests that the agents made a mistake in their calculation that 68 and 68A were one residence. As the Government elaborated at oral argument, the building is a single residential structure, and the door to 68A is on the side of the building, accessed from the porch. Notably, "the door was marked not with actual letters of any permanency, but marked in black marker . . . so it is certainly not something that would be observable from the street" by the FBI when they conducted physical surveillance in advance of applying for the search warrant. (Tr. 20:23 to 21:11.) There is nothing to suggest that the agents

26

acted with reckless disregard.  Indeed, their actions belie any such suggestion because as soon as they entered 68 and realized that 68A was an arguably distinct residence that did not come within the ambit of the search warrant, the agents immediately exited 68 and dispatched an agent to obtain a corrected search warrant.  These actions by the FBI demonstrate the exact opposite of reckless disregard on the execution of the search warrant.

Therefore, Christie's request for a *Franks* hearing will be denied because he has not satisfied the requirements of *Franks* to mandate a hearing, especially given this Court's conclusion that the affidavit would have been sufficient to support a finding of probable cause even if any alleged material omissions had been included.  *See United States. v. Brown*, 3 F.3d 673, 677-78 (3d Cir. 1993) (affirming district court's denial of a *Franks* hearing for failure to make a "substantial preliminary showing of the affiant's untruthfulness" even though defendant had proffered his own affidavit, the affidavit of a private investigator, and evidence showing several inaccuracies in the warrant affidavit).

**B.    A hearing to determine whether the Government engaged in "outrageous conduct" is denied.**

In addition to the foregoing requests for a *Franks* hearing, Christie also seeks a hearing, outside of the *Franks* context, to determine whether evidence should be suppressed or even the Superseding Indictment dismissed "based upon the [G]overnment['[]s outrageous conduct." (Christie Br. at 14.)  "It is the law of this circuit that a criminal defendant may raise a due process challenge to an indictment against her based on a claim that the government employed outrageous law enforcement investigative techniques."  *United States v. Nolan-Cooper*, 155 F.3d

27

221, 229 (3d Cir. 1998). But the Third Circuit, "[w]hile continuing to recognize, in theory, the outrageousness defense," has "nonetheless observed that, because of the extraordinary nature of the doctrine, the judiciary has been 'extremely hesitant' to uphold claims that law enforcement conduct violates the Due Process clause." *Id.* at 230 (citing First Circuit case as declaring the defense "moribund" because "[t]he banner of outrageous misconduct is often raised but seldom saluted"); *see also United States v. Diaz*, 189 F.3d 1239, 1245 (10th Cir. 1999) (recognizing severe limitations of defense and acknowledging suggestion that the "court should . . . reject the outrageous government conduct defense as a chimera or unicorn–often hunted but never taken into captivity"). Indeed, the Third Circuit, in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), found that the government's investigatory misconduct was so egregious that the due process clause demanded dismissal of the indictment against him, but the *Nolan-Cooper* court, twenty years later, observed that the Third Circuit had "not found another set of facts that satisfy the rigorous requirements" of the outrageous misconduct defense. *Nolan-Cooper*, 155 F.3d at 224.

Nevertheless, Christie points to *Twigg* and a prior case, *United States v. West*, 511 F.2d 1083 (3d Cir. 1975), to support his argument that a hearing should be held "to determine the timing and extent of the agents' actions . . . and whether it amounts to outrageous governmental conduct." (Christie Br. at 14-15.) But none of the Government conduct that Christie suggests qualifies as outrageous conduct even comes close to the activities of law enforcement in the cases cited by Christie. In *Twigg*, the government directed a convicted felon striving to reduce the severity of his sentence to create a drug lab. The government further encouraged the lab's creation by providing a farmhouse as a secure location, twenty percent of the glassware needed,

and, importantly, the indispensable chemical ingredient necessary to make the methamphetamine.  It was only after all of this government involvement that the defendants in *Twigg* became tangential players in the drug-making scheme at the behest of the felon working as an agent for the government.  In other words, "*Twigg* . . . involved a quite egregious case of government overinvolvement in which the government's undercover operative essentially concocted and conducted the entire illicit scheme."  *Nolan-Cooper*, 155 F.3d at 230.

Here, Christie does not allege that he was contacted by Lochmiller or an agent of the FBI, nor does he allege that they encouraged him to engage in the possession, receipt, or advertising of child pornography.  At most, Christie alleges that the rules of NAMGLA required the website users to make at least one post every month in order to retain access to the website.  Thus, Christie implicitly contends that if the FBI was involved in the creation of these rules, then arguably it encouraged the exchange of child pornography.  But Christie neglects to mention that access to forums on the website appears to have been predicated on making an initial post of child pornography.  (*See* Aff. ¶ 21(b).)  That is, Christie could not obtain access to the website, or at least certain portions of it, without first committing an unlawful act of advertising child pornography.  This can hardly be considered analogous to *Twigg* where the government essentially created the illegal product, had its undercover operative give the illegal product to the unwitting defendant, and then arrested the defendant after receiving a call from the operative that the defendant had the illegal product in his possession.  There is no suggestion that the FBI created the child pornography or gave it to Christie to post on NAMGLA so that he could be charged with advertising, receipt, or possession.  On the contrary, there is a strong suggestion that any child pornography that Christie posted on NAMGLA came into Christie's possession via his

29

own perusal of the Internet because there is no suggestion that Christie created any of the videos or images that he is charged with advertising or possessing.  In other words, Christie's case is not analogous to *Twigg* because Christie came by the illegal product and advertised it of his own accord, irrespective of any Government wrongdoing alleged by Christie.

Christie points to another case, *West*, as further support for his argument that the Government engaged in outrageous conduct.  But *West* is no better an analogue than *Twigg*.  In *West*, a drug dealer working with the government approached an old friend of his who was a City of Philadelphia truck driver who had never had any involvement with narcotics.  The drug dealer proposed a scheme to the truck driver whereby they would sell fake or "over-cut" heroin.  The drug dealer proposed that he would supply the heroin and that the truck driver need only pose as the seller.  As it turned out, the drug dealer had planned this scheme with an undercover police officer, who was going to pose as the buyer from the truck driver seller.  In other words, *West* involved "a confederation of two government agents, one an informer who . . . actually supplied the narcotics in question and the other an undercover officer who, as prearranged with the informer, bought this contraband from the accused third person whom the informer had persuaded to join with him in a selling venture."  *West*, 511 F.2d at 1085.  Again, just as in *Twigg*, the facts in *West* hardly compare to the facts in Christie's case.  There is nothing to suggest that Lochmiller and the FBI conspired to produce or distribute child pornography, and then placed such illicit material in Christie's hands so as to catch and charge him with a crime.  On the contrary, it appears that Christie independently sought out NAMGLA and actively participated in the exchange of child pornography through that website.  It further appears as though the FBI simply sat, figuratively, in the corner of the room and observed Christie engage in

30

illegal activity of his own free will.

Moreover, the Third Circuit has, since *Twigg*, rejected the outrageous conduct defense in a context that appeared much more egregious than anything Christie has alleged here.  In *Nolan-Cooper*, an undercover IRS agent posed as a wealthy drug dealer so as to catch a Philadelphia lawyer engaged in a money-laundering scheme.  In the course of the agent's undercover operation, he purported to develop a romantic relationship, and ultimately had sex with the female lawyer.  Nevertheless, our Court of Appeals found these circumstances insufficient to come within the outrageous conduct defense.  Given the facts of *Nolan-Cooper*, Christie's allegations pale in comparison.  Therefore, the Court will deny Christie's request for a hearing on this matter given the paucity of allegations amounting to anything remotely egregious.  Should more information come to light that more appropriately fits within the *Twigg/West/Nolan-Cooper* framework, this Court will address such revelations at the appropriate time.


**V.    Discovery Motions**

In addition to the foregoing motions, Christie also has moved for certain discovery.  But, as the Government notes, many of Christie's requests are addressed in this Court's standing discovery Order ("SDO") dated May 22, 2007.  For example, Christie's request for evidence favorable to him, and unfavorable to the prosecution, i.e., *Brady* evidence, is addressed in SDO ¶ 1(f) and (g).  To the extent that Christie seeks early disclosure of *Brady* or *Giglio* material, the Third Circuit has held that ordering disclosure on the day the witness is to testify satisfies the requirements of due process.  *See United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983).

In addition, Christie's request for Rule 404(b) evidence is addressed in SDO ¶ 3, and such

evidence is to be turned over to Christie within 10 days of trial.  Accordingly, Christie's request

for Rule 404(b) evidence is not only redundant, but premature given that we are still weeks away

from trial.[9]  As for Christie's request for discovery of all scientific and expert reports, pursuant to

Federal Rule of Criminal Procedure 16(a)(1)(E), that too is addressed in SDO ¶ 1(d) and (e).

Furthermore, Christie's request for Jencks Act[10] material is addressed in SDO ¶ 4.[11]  To the

extent that Christie requests "early disclosure" of such material, the Government has declared

that it "will voluntarily produce *Jencks* material three days before the testimony of each witness."

(Gov't Br. at 17.)  Notably, the express statutory language of the Jencks Act declares that the

---

[9] The Government's brief does not mention the SDO's requirement that Rule 404(b) evidence be disclosed 10 days before trial.  Indeed, the Government takes the position that no specific time limit is required by Rule 404(b), and that it intends to provide the evidence "with reasonable notice in advance of trial."  (Gov't Br. at 15.)  To the extent the Government has overlooked this part of the SDO, the Court remains committed to the Order and expects the Government to comply.

[10] The Jencks Act, 18 U.S.C. § 3500, provides in relevant part: "(a) . . . no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use."

[11] Christie has also requested disclosure of "law enforcement's rough notes of any such statements, including those of Mr. Christie."  (Christie Br. at 21.)  Notes made by law enforcement personnel are discoverable only insofar as they come within the requirements of *Brady*, *Giglio*, and the Jencks Act.  *See United States v. Ramos*, 27 F.3d 65 (1994).  Thus, Christie's request in this regard is a redundantly specific subset of his general motion, which is itself somewhat redundant inasmuch as those materials are already part of the Court's standing discovery Order.

defendant is not entitled to such material until the Government's witness has testified. Thus, Christie's request for disclosure earlier than the Government's voluntary disclosure three days in advance will be denied. *See United States v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978) ("[T]he Jencks Act flatly states that disclosure of prior statements by government witnesses may not be compelled 'until said witness has testified on direct examination in the trial of the case.'").

As for Christie's request for information regarding any lost or destroyed evidence, the Government has advised the Court that it is unaware of any such evidence, and Christie acknowledges that he too is unaware of any such evidence. Accordingly, this request is moot until such time as the status quo changes.

In addition, Christie requests a hearing on the admissibility of his prior convictions for impeachment purposes under Federal Rule of Evidence 609. "The Government does not oppose this request." (Gov't Br. at 19.) Thus, unanimity reigns, and the Court will oblige the parties' request for a hearing at the propitious time on the admissibility of prior convictions of any witness, not just Christie.

## VI.    Christie's Independent Motions

As previously indicated, Christie's attorneys, at the outset of oral argument, noted that Christie was unhappy with the pretrial motions that they filed on his behalf.[12] This Court

---

[12] MR. YAUCH: It was brought to our attention today. We met with Mr. Christie of course numerous times and today I have been told through Ms. Gauli-Rufo and through Mr. Christie that he is unhappy with the pretrial motions that were filed on his behalf by the office of the Federal Public Defender.

. . . .

He believes that there are additional motions that should be brought to the Court's attention. He desires the ability to be able to argue motions that were not raised in our moving papers. Now, I

permitted Mr. Christie to orally submit a motion independent of that briefed on his behalf by his counsel, the Office of the Federal Public Defender.  The Court entertained Mr. Christie's oral submission, and at that time received his six-page handwritten brief in connection with that motion.  Subsequently, Mr. Christie mailed to the Court a thirteen-page continuation brief, with three attached exhibits.  Specifically, Mr. Christie "attack[s] the affidavit, warrant application, search warrant and superceding indictment dated 10-19-07 for vagueness, overbrea[d]th, particularity and staleness."  (Christie Supp. Br. at 1.)  The Court has carefully read Mr. Christie's written submissions, which articulate his challenges to the affidavit and warrant.  The Court will attempt to synthesize his arguments so as to give full consideration to each.

> **A.** **The search warrant affidavit did not contain stale information, and it provides an adequate nexus between the articles to be searched and Mr. Christie's residence such that the warrant was supported by probable cause.**

Part I of Mr. Christie's submission contends that the FBI agent's affidavit in support of the search warrant does not (1) "provide a nex[u]s between the articles to be searched and seized and the residence on Phillips Road"; (2) "provide [probable] cause to believe said articles would be found in residence on Phillips Road"; and (3) "establish an ongoing criminal activity* thus rendering 30 day old information <u>stale</u> - * (as opposed to an isolated incident)."  (Christie Supp. Br. at 4.)  Mr. Christie provided the Court with a string citation of 37 cases in support of his argument, but he focuses the Court's attention on a handful that he apparently believes are especially important.  Notably, the crux of Mr. Christie's written analysis is found in points one

---

have advised Mr. Christie that as his lawyer, it is our job to analyze the case, meet with him, as we have numerous times, and determine which are the proper and best pretrial motions to be brought on his behalf, and we have done that.  (Tr. 2:22 to 3:14.)

and two quoted above, i.e., nexus and probable cause.  Mr. Christie does not devote any analysis, in Part I of his brief, to the issue of staleness.  Accordingly, the Court will address the heart of his argument regarding nexus and probable cause, but will also endeavor to give appropriate treatment to the issue of staleness.

Mr. Christie first cites *United States v. Loy*, 191 F.3d 360 (3d Cir. 1999), which involved an individual who pled guilty, after his motion to suppress was denied, to knowingly receiving child pornography through the mails and knowingly possessing child pornography.  *Id*. at 363. The defendant's motion to suppress challenged the search warrant as lacking probable cause because the warrant was an "anticipatory warrant" that had an insufficient nexus between the contraband to be seized and the defendant's residence.  Specifically, the defendant had ordered child pornography through the mail, and had it sent to his post office box, not his house.  As such, the police sought an anticipatory search warrant to search the defendant's home because they anticipated that he would take the contraband from the post office to his house.  The Third Circuit explained that, "[a]s with all warrants, there must be a sufficient nexus between the contraband to be seized and the place to be searched before an anticipatory warrant can be issued."  *Id*. at 365.  The *Loy* court ultimately concluded that there was an insufficient nexus for the issuing judge to conclude that the defendant would take the child pornography from his post office box to his home to view it, rather than some other location.  Accordingly, the anticipatory warrant for a search of the defendant's home was not supported by probable cause.

Mr. Christie also cites *United States v. Rowland*, 145 F.3d 1194 (10th Cir. 1998), which is cited favorably in *Loy*.  *Rowland*, like *Loy*, involved a defendant charged with receipt and possession of child pornography, which the defendant obtained via a private post office box.  The

35

defendant in *Rowland* also moved to suppress the evidence seized on the ground that the anticipatory search warrant lacked probable cause.  Law enforcement obtained the anticipatory search warrant under the assumption that the defendant would take the child pornography from the post office box to his home.  The Tenth Circuit concluded that the warrant lacked probable cause because there was an "absence of any facts in the affidavit linking the contraband to [the defendant's] home."  *Id*. at 1205.[13]

Mr. Christie's reliance on *Loy* and *Rowland* is misplaced.  The obvious difference between those cases and this one is that they involved an anticipatory search warrant, whereas this case involves a traditional warrant for Mr. Christie's residence because there was probable cause to believe that child pornography was currently located in his residence, not that it was merely *en route*, or likely to arrive there by the time of the search.  Notwithstanding that technical distinction, the real problem in *Loy* and *Rowland* was that there were insufficient facts from which a neutral and detached magistrate judge could conclude that the defendants had contraband in their *homes*, i.e., the place to be searched.  Mr. Christie's case is easily distinguishable because the FBI had ample evidence, included in the warrant affidavit, that Mr. Christie had distributed, received, and currently possessed child pornography in his Phillips Road home, which was the place to be searched.

---

[13] Mr. Christie's written submission quotes language from *Rowland* that is favorable to his position, but that language comes from the dissent.  As such, its persuasive authority is essentially nil inasmuch as the Third Circuit, in *Loy*, relied on the majority's opinion in *Rowland*, not the dissent's.  That error notwithstanding, this Court understands Mr. Christie's intent to rely on the portions of the majority's opinion that conceivably weigh in his favor, namely the court's holding that the anticipatory search warrant was not supported by probable cause, and the reasons for that holding.  Nevertheless, for the reasons stated in the body of this Opinion, *Rowland* is so factually distinguishable from this matter as to be effectively useless in guiding this Court's decision.

For example, the affidavit clearly details how the FBI observed a user named "franklee" on the NAMGLA website post links to what the agents reasonably believed was child pornography.  (*See* Aff. at ¶¶ 22-24.)  Furthermore, the affidavit declares that the FBI determined that "franklee" accessed the Internet through a particular IP address that "was assigned to 68A Phillips Road, Newton, New Jersey, and listed a telephone number for Russell Christie."  (Aff. at ¶¶ 26-27.)  Together, these facts attested to in the affidavit provide a sufficient nexus between the contraband to be seized (child pornography) and the residence to be searched (Russell Christie's residence on Phillips Road).  Unlike in *Loy* and *Rowland*, there was no suggestion that Christie's illegal activity occurred somewhere other than in his house.  In other words, there was nothing to indicate that he accessed the Internet and engaged in illegal activity from any computer other than the one located at the Phillips Road address.  On the contrary, every piece of evidence obtained by the FBI pointed to the Phillips Road address and no other (irrespective of the 68 versus 68A issue).

Mr. Christie also cites *United States v. Weber*, 923 F.2d 1338 (9th Cir. 1991) for the proposition that the warrant in this case lacked probable cause because the affidavit did not contain any reference to expert opinion or testimony.  (Christie Supp. Br. at 2 ("The affidavits not only lack a conclusion, they lack <u>all</u> expert opinion as well.  No expert testimony, no probable cause.").)  But *Weber* did not hold that an affidavit must contain expert opinion or testimony.  On the contrary, it simply noted that the affidavit in that case contained expert opinion, and further noted, using permissive language, that "[i]t is well established that expert opinion *may* be presented in a search warrant affidavit."  923 F.2d at 1345 (emphasis added).  Furthermore, the *Weber* court explained that "if the government presents expert opinion about

37

the behavior of a particular *class* of persons . . . the affidavit must lay a foundation which shows that the person subject to the search is a member of that class." *Id*. (emphasis added).  In that case, the affidavit gave a general description of the proclivities of pedophiles as a basis for concluding that certain materials were likely to be found in the defendant's home.  The Ninth Circuit concluded that the affidavit lacked any explanation as to why the defendant fell into the class of pedophiles such that those materials were likely to be found in his home.

There is no similar problem here such that the warrant lacked probable cause.  First, even under *Weber*, expert opinion is not *required* in a search warrant affidavit.  Second, assuming there was such a requirement, Mr. Christie is wrong to conclude that the affiant in this case does not qualify as an expert in child pornography investigations.  Indeed, SA Magness's affidavit declares that he has been assigned to the FBI's Innocent Images National Initiative, which investigates individuals involved in the online sexual exploitation of children, that he has received "training in the area of child pornography and child exploitation," and that he has participated in the execution of about forty search warrants, two of which involved child exploitation and child pornography offenses.  (Warrant Affidavit at ¶ 1.)  Third, the affidavit in this case did not purport to place Mr. Christie in a class of persons, such as pedophiles, as was done in *Weber*.  In that regard, this case also differs from *Weber* inasmuch as the objects of the search warrant were directly tied to Mr. Christie's online activities, not based upon some amorphous categorization.  In other words, the FBI sought a warrant to search Mr. Christie's home for media containing child pornography, and that warrant was supported by probable cause stemming from Mr. Christie's posting of links to child pornography on NAMGLA.  In plain English, the objects of the search were rooted in the conduct of Mr. Christie on NAMGLA.  In

38

sum, the affidavit contained everything necessary for the magistrate judge to find probable cause that evidence of criminal activity would be found in Christie's residence on Phillips Road.

Again, Part I of Mr. Christie's submission contends that the FBI agent's affidavit in support of the search warrant (1) lacked a nexus between the criminal activity and the Phillips Road address; (2) lacked probable cause; and (3) consisted of stale information.  (*See* Christie Supp. Br. at 4.)  Having addressed the first two points, the Court now turns to the issue of staleness.  But, as previously mentioned, Mr. Christie provides the Court with no analysis of why he believes the warrant affidavit was stale, other than to state, in conclusory fashion, that it failed to "establish an ongoing criminal activity* thus rendering 30 day old information stale - * (as opposed to an isolated incident)."  (Christie Supp. Br. at 4.)

"Age of the information supporting a warrant application is a factor in determining probable cause.  If too old, the information is stale, and probable cause may no longer exist.  Age alone, however, does not determine staleness."  *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (internal citations and quotation marks omitted).  "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant.  Rather, we must also examine the nature of the crime and the type of evidence."  *Id*. (internal citations and quotation marks omitted).

In *Harvey*, a case involving a defendant charged with possession of child pornography, the Third Circuit addressed the issue of staleness in a warrant affidavit, which recounted that the defendant had received deliveries of child pornography between two and fifteen months before execution of the search warrant.  In affirming the probable cause of the warrant, the *Harvey* court noted the decisions of other courts that had rejected staleness challenges.  For example, in *United*

*States v. Rabe*, 848 F.2d 994 (9th Cir. 1988), the court of appeals held that there was no staleness problem where the warrant application occurred in August, and the last correspondence, which provided the basis for probable cause, occurred two months earlier in June.  The *Harvey* court also noted the decision in *United States v. Rakowski*, 714 F. Supp. 1324, 1330-31 (D. Vt. 1987), in which the district court affirmed the issuance of a search warrant where child pornography mailings occurred one month and six months before the issuance of the search warrant. Ultimately, the Third Circuit in *Harvey* found that the search warrant was not based upon stale information even though the most recent mailings of child pornography occurred about two months before the warrant's issuance.  *Harvey*, 2 F.3d at 1323.

Here, Mr. Christie seems to argue that the information upon which the search warrant was based was stale because the last posting by "franklee" occurred about a month before the warrant's issuance.  But the information in this case was by no means stale as that term has been interpreted by our Circuit and the other courts it relied upon in *Harvey*.  Here, the warrant affidavit detailed a posting by "franklee" that occurred on June 25, 2006, before the warrant issued one month later in July 2006.  There is nothing to suggest that the June 2006 posting was a discrete event such that a warrant issuance one month later would be so far removed in time as to be lacking probable cause for staleness reasons.  On the contrary, the warrant affidavit also recounted another posting by "franklee" on the same day in June, a few hours later, and yet another posting earlier in April 2006.[14]

_____

[14] Inexplicably, the Superseding Indictment does not appear to charge Christie with any crime related to the posting in April 2006 or the two postings in June 2006.  Instead, the Government has charged Christie for one posting made in October 2005, three in November 2005, and two in January 2006.

Even if the only posting by Christie occurred in late June 2006, that would not justify, on staleness grounds, suppressing the evidence seized pursuant to a warrant issued one month later. Indeed, as the affidavit recounts, the FBI spent considerable time in July attempting to ascertain the location of the individual associated with the "franklee" moniker and verifying with various entities that Russell Christie on Phillips Road in Newton, New Jersey was the proper target of the investigation. (*See* Warrant Aff. at ¶¶ 25-34.)  In other words, the Government engaged in a thorough and careful investigation to ensure that it did not target the wrong individual.

As previously noted, Mr. Christie did not provide the Court with a coherent argument for why he believes the warrant affidavit contained stale information rendering the warrant lacking in probable cause, but he did string cite thirty-seven cases, canvassed from almost every court of appeals in the country.  But many of the cases that Mr. Christie cites that actually address staleness issues do not support his argument.  *See, e.g.*, *United States v. Irving*, 452 F.3d 110, 116 (2d Cir. 2006) (rejecting staleness challenge where affidavit mentioned letters, written by suspect, "discussing exploitation of children" that had occurred about two years prior to the warrant's issuance); *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005) (rejecting staleness argument in case where warrant affidavit contained "evidence that the plumbing inspectors' misconduct was an established, routine practice that had spanned numerous years and had continued at least up until just months prior to the District Court's initial authorization of the video surveillance"); *Rivera v. United States*, 928 F.2d 592, 602-03 (2d Cir. 1991) (relying on "precedents upholding reliance on information 22 days to 18 months old" to reject staleness challenge where informant had received information within a week of the warrant's issuance). As for the few cases cited by Mr. Christie that actually found probable cause did not exist

because of a staleness issue, those cases are wholly inapposite to this case.  *See, e.g., United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002) (finding no probable cause because information was stale where affidavit recounted statement of a mother that declared that suspect, six months earlier, had shown her son a video of an adult woman performing a sexual act with a horse).

In sum, Mr. Christie's staleness argument is bereft of analytical potency.  The Court holds that the search warrant was not based on stale information so as to render the warrant unsupported by probable cause.  Quite the contrary, the warrant issued based upon the attestation that someone at Mr. Christie's home advertised child pornography a mere month prior to the warrant's issuance.  That is plainly sufficient to withstand any staleness challenge.  *See Harvey*, 2 F.3d at 1323; *see also United States v. Eberle*, 266 F. App'x 200, 206 (3d Cir. Feb. 25, 2008) (rejecting argument that evidence of child pornography being uploaded *three years* prior to warrant was stale evidence); *United States v. Shields*, 458 F.3d 269, 279 n.7 (3d Cir. 2006) (suggesting alternative holding by rejecting staleness argument in child pornography case where online e-groups that were the basis for the warrant had been defunct for nearly nine months); *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 148 (3d Cir. 2002) ("We reject the argument that this 11-month gap rendered the information in the affidavit so clearly stale that reasonable officers could not have believed that the warrant was valid.").

**B.      The search warrant affidavit is neither overbroad nor lacking in particularity.**

In Part II of his brief, Mr. Christie variously argues that the affidavit and the search warrant are overbroad and lacking in particularity.  He also makes a similar argument with regard to the Superseding Indictment.

The Fourth Amendment declares: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and *particularly* describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV (emphasis added).  The requirement of particularity prevents the issuance of a general warrant, which essentially authorizes "a general exploratory rummaging in a person's belongings."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see also United States v. Yusuf*, 461 F.3d 374, 393 (3d Cir. 2006); *United States v. Peden*, 891 F.2d 514, 517 (5th Cir. 2003).  For example, the Supreme Court has held that a warrant authorizing the search for evidence of "obscene materials" was an invalid general warrant.  *See Marcus v. Search Warrant*, 367 U.S. 717 (1961).  The test for whether a warrant should be invalidated as general is whether the warrant "vest[ed] the executing officers with unbridled discretion to conduct an exploratory rummaging through [the suspect's belongings] in search of criminal evidence."  *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982); *see also $92,422.57*, 307 F.3d at 149; *United States v. Layne*, 43 F.3d 127, 132 (5th Cir. 1995) ("To test whether the particularity requirement is satisfied requires the court to ask if the description in the warrant would permit an executing officer to reasonably know what items are to be seized.") (citation and internal quotation marks

43

omitted).

There is little doubt that the search warrant here satisfies the particularity requirement with regard to the property to be searched, at least after the officers discovered that 68 Phillips Road was the incorrect address and they applied for and received a new search warrant for the correct address of 68A Phillips Road. The question then, is whether the search warrant particularly described "the persons or things to be seized." U.S. Const. amend. IV. The answer, quite simply, is yes, the warrant satisfies the particularity requirement of the Fourth Amendment. The warrant provides a detailed list, spanning four pages, of the items and types of items to be seized; this is the same list that was provided in the warrant affidavit. For example, it authorizes the agents to search and seize "[a]ny files, logs, or records reflecting access to, viewing, saving of, or posting of messages to the website www.namgla.net." (Warrant at ¶ (a).) In addition, it authorizes the search and seizure of "[a]ny visual depiction of a minor involved in sexually explicit conduct . . . [a]ny correspondence or records . . . pertaining to the receipt, possession, or distribution of visual depictions of a minor involved in sexually explicit conduct." (*Id*. at ¶¶ (c)-(d).) In essence, the warrant described the items to be seized and it did not vest the executing officers with unbridled discretion to search for and seize whatever they wished. *See Yusuf*, 461 F.3d at 397 (rejecting particularity challenge where warrant "explicitly incorporated an affidavit detailing the items that the government intended to search and seize"); *$92,422.57*, 307 F.3d at 150 (rejecting particularity challenge where warrant authorized search and seizure of "receipts, invoices, . . . ledgers . . . sales journals, and correspondence [as well as] computers, computer peripherals . . . and software in order to conduct an off-site search for electronic copies of the items listed above"). Even a case cited by Mr. Christie supports this holding. *See Peden*, 891

44

F.2d at 517 (rejecting particularity challenge in child pornography case where warrant authorized search and seizure of "visual depictions of minors engaging in sexually explicit conduct . . . including, but not limited to various books, magazines, films, and videos . . .  envelopes, letters, and other correspondence constituting orders to buy, offers to sell or trade [s]uch child pornography address books; mailing lists; supplier lists and other documents or records pertaining to the producing, selling, trading, purchasing, ordering and advertising of child pornography").

Having dispensed with Mr. Christie's specious particularity challenge, the Court now turns to his challenge of overbreadth in the warrant.  As the Third Circuit has explained, "[t]here is a legal distinction between a general warrant," which is invalid because it lacks particularity, "and an overly broad warrant," which describes in specific terms the items to be seized, "but authorizes the seizure of items as to which there is no probable cause." *Yusuf*, 461 F.3d at 393 n.19.  "The fact that the warrant authorize[s] a search for a large amount of documents and records does not necessarily render the search invalid so long as there exists a sufficient nexus between the evidence to be seized and the alleged offenses." *United States v. Am. Inv. of Pittsburgh*, 879 F.2d 1087, 1105-06 (3d Cir.1989); *see also Yusuf*, 461 F.3d at 394.

In *Loy*, a case previously relied upon by Mr. Christie, the Third Circuit rejected an overbreadth challenge where the warrant authorized the search and seizure of "[p]hotographs, drawings, magazines or other visual media to include photographic slides, videotapes or literature depicting children under the age of 18 years engaging in sexually explicit conduct." *Loy*, 191 F.3d at 369.  Specifically, the defendant in *Loy* objected to the language "children under the age of 18" as being insufficient to distinguish between adults and children.  Our Court of

Appeals found little merit in that argument, concluding that the phrase "is not so uncertain as to make a warrant defective, even though it might lead to the mistaken seizure of adult pornography." *Id*.  In reaching its conclusion, the *Loy* court noted decisions by other courts reaching similar conclusions.  *See id*. (citing *United States v. Hurt*, 795 F.2d 765, 772 (9th Cir. 1995) (holding that a warrant was sufficiently particular where it authorized the search for materials "depicting minors (that is, persons under the age of 16) engaged in sexually explicit conduct"); *United States v. Layne*, 43 F.3d 127, 132 (5th Cir. 1995) (upholding search warrant that referred to the items to be seized as "child pornography")).

Mr. Christie insists that the warrant is "grossly [sic] overbroad" because it permits the search and seizure of "calculators and electronic phone dialers as well as 'any' magnetic, electronic or optical storage devices capable of storing data."  (Christie Supp. Br. at 5.)  But Mr. Christie fails to note that the paragraph to which he refers falls under the broader paragraph noting that such items will need to be seized so that law enforcement can "search for data that is capable of being read or interpreted by a computer."  (Warrant at ¶ (j).)  As previously noted, a warrant is not overbroad "so long as there exists a sufficient nexus between the evidence to be seized and the alleged offenses."  *Am. Inv. of Pittsburgh*, 879 F.2d at 1106.  Here, Mr. Christie was suspected of multiple crimes of advertising child pornography on the Internet, which the Court assumes he accessed via his computer, rather than by telekinesis.  The entirety of the FBI's investigation of him focused on his use of a computer to receive, distribute, and advertise child pornography.  Thus, it is not overbroad for the warrant to authorize the seizure of "any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer memory buffers, smart cards,

46

PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants" so that law enforcement could "search for data that is capable of being read or interpreted by a computer."  (Warrant at ¶ (j)(3).)

The cases cited by Mr. Christie do not support his argument.  For example, he cites *United States v. Simpson*, 152 F.3d 1241, 1252 (10th Cir. 1998), but the language upon which he relies comes not from the court's opinion, but from the concurring opinion, a fact that undercuts any weight that case might have for Mr. Christie.[15]  The same is true for Mr. Christie's citation to the concurrence in *United States v. Spilotro*, 800 F.2d 959, 969 (9th Cir. 1986).  Mr. Christie's reliance on *United States v. Cochran*, 806 F.Supp. 560, 564-65 (E.D. Pa. 1992) is also misplaced inasmuch as that case found a warrant overbroad because it simply permitted the seizure of "professionally produced child pornography . . . by leaving the determination of what constitutes 'pornography' to the individual judgment of the officers executing the search."  The facts of this case are different.  Here, the warrant particularly described the items to be seized, and limited such items to those involving a "visual depiction of a minor involved in sexually explicit conduct."  (*See, e.g.*, Warrant at ¶¶ (c)-(g).)  The statutory definition of child pornography is found in 18 U.S.C. § 2256(8): "'child pornography' means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct [of a

---

[15] Mr. Christie cites the concurrence's statement that use of the general term "child pornography" was overbroad and not particular, but even if that was part of the Tenth Circuit's decision, which it most certainly is not, our own Court of Appeals has implied that it would hold to the contrary when it favorably cited a Fifth Circuit case that upheld a search warrant that referred to the items to be seized simply as "child pornography."  *See Loy*, 191 F.3d at 369 (citing *Layne*, 43 F.3d at 132).

minor]."  In that regard, the warrant in this case was nothing like that in *Cochran*, because here the warrant specifically declared that the officers were looking for "visual depiction[s] of a minor involved in sexually explicit conduct," which perfectly tracks the statutory language.  Thus, the warrant was not overbroad, and could hardly have been narrower.[16]

### C.     The Superseding Indictment is neither overbroad nor lacking in particularity.

Somewhat relatedly, Mr. Christie also argues that the Superseding Indictment is "overbroad and not particular [because] Counts 1-6 fail to identify the constitutional definition of 'sexually explicit conduct,' while Counts 7 and 8 simply define such as 'Section 2256(8).'" (Christie Supp. Br. at 6.)[17]  To support his argument, Mr. Christie points to *United States v. Thomas*, 893 F.2d 1066, 1069 n.3 (9th Cir. 1990), which involved an indictment that Mr. Christie

---

[16] Mr. Christie also argues that the affidavit and warrant are invalid because they "make no mention of the leagel [sic] definition of child pornography, I.e., images of minors engaged in sexually explicit conduct as defined by §§ 2256(2) and 2256(8)(A)."  (Christie Supp. Br. at 5.) Of course, nothing could be further from the truth because, as recounted above, the warrant specifically provided that the officers were to search for visual depictions of minors involved in sexually explicit conduct.  To the extent that the warrant omits an actual citation to § 2256, or its relevant subsections, that is of absolutely zero legal consequence here.  To conclude otherwise would be to elevate form over substance to a constitutional degree.

[17] The Court notes at the outset that there is no such thing as a "constitutional" definition of sexually explicit conduct; it is a statutory definition, not a constitutional one.  Conceivably, Mr. Christie intended to write "constitutionally *valid* definition."  *See United States v. Irving*, 452 F.3d 110, 121 (2d Cir. 2006) ("[T]he superseding indictment specifically made reference to the constitutionally valid definition of child pornography.").  The quote from *Irving* is a reference to the Supreme Court's decision in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002), in which the Court struck down, as facially violative of the First Amendment, two subsections of 18 U.S.C. § 2256(8).  The *Irving* court, by using the term "constitutionally valid," was simply noting that the indictment in that case referenced the provisions of § 2256(8) that had not been rendered unconstitutional by *Free Speech Coalition*.

48

apparently believes "spells out the precise criminal activity in adequate statutory language." (Christie Supp. Br. at 6.)  What Mr. Christie fails to understand is that approval of the language of the indictment used in one case does not necessarily mean that the language used in the instant Superseding Indictment is somehow deficient.

An indictment is sufficient so long as it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution."  *United States v. Vitillo*, 490 F.3d 314 (3d Cir. 2007); *see also United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007).  In addition, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."  *Kemp*, 500 F.3d at 280 (quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989)); *see also United States v. Dentler*, 492 F.3d 306, 309 (5th Cir. 2007).

Here, Counts 1 through 6 satisfy the above standard.  All of the first six counts charge that Christie "did knowingly make, print, and publish . . . a notice and advertisement . . . [of] visual depictions . . . which involved the use of a minor engaging in sexually explicit conduct." (Superseding Indictment at ¶ 9.)  In addition, those same counts also charge that Christie knew that "such notice and advertisement would be transported across state lines by any means, including a computer . . . and such notice and advertisement was transported across state lines." (*Id*.)  Not surprisingly, this very specific language closely tracks the language of the statute that Mr. Christie is charged with violating: "Any person who . . . knowingly makes, prints, or

49

publishes, or causes to be made, printed, or published, any notice or advertisement seeking or

offering--(A) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual

depiction, if the production of such visual depiction involves the use of a minor engaging in

sexually explicit conduct and such visual depiction is of such conduct."  18 U.S.C.A. §

2251(d)(1)(A).  In short, Counts 1 through 6 contain the elements of the offense, sufficiently

apprise Mr. Christie of what he must be prepared to meet, and allows Mr. Christie to invoke

double jeopardy in the event of a subsequent prosecution.  Therefore, Counts 1 through 6 are not

overbroad or lacking in particularity to a degree that is unconstitutional.

As for Counts 7 and 8, Mr. Christie argues that those counts do not contain certain

"limiting language" that he believes is required.  He points to a decision from the Eastern District

of Michigan to implicitly argue that Counts 7 and 8 should have stated on their face that the

alleged child pornography in this case consisted of "depictions of a minor engaging in sexually

explicit conduct."  *See United States v. Fisk*, 255 F. Supp. 2d 694, 701-02 (E.D. Mich. 2003).  In

*Fisk*, the defendant argued that the indictment did not specify the subparagraph of Section

2256(8) that defines "child pornography" in that case.  But the district court noted that the

indictment did state that the defendant violated Section 2252A(a)(2)(B), "by receiving and

possessing material consisting of 'depictions of a minor engaging in sexually explicit conduct.'

In other words, the material referenced in the indictment is alleged to be pornography produced

with real children, which 18 U.S.C. § 2256(8)(A) prohibits, and which is not protected speech."

*Id*. at 701-02.  Ostensibly, Mr. Christie believes that the Superseding Indictment against him

should be dismissed because it fails to contain the exact same words as those found in *Fisk*.

But Counts 7 and 8 both state, in their respective first paragraphs, that "Paragraphs 1

through 7 of Counts One through Six are realleged and incorporated by reference as if fully set forth herein." Those paragraphs contain, *inter alia*, the following language: "The NAMGLA Website contained . . . links to image and movie files . . . depicting pubescent and pre-pubescent female minors engaged in sexually explicit conduct with other . . . minors, and with adults. The sexually explicit conduct depicted in these image and movie files included genital-genital contact, oral-genital contact, masturbation, and the lascivious exhibition of the genitals and pubic area of the female minors." (Superseding Indictment ¶ 6.) In addition, Counts 7 and 8 both declare that Mr. Christie knowingly, possessed, received and attempted to receive child pornography as defined in § 2256(8). As previously noted, Section 2256(8) provides that

> "child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where--
>
> (A)   the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
>
> (B)   such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or
>
> (C)   such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

18 U.S.C. § 2256(8). Except for subparagraph (B), "'sexually explicit conduct' means actual or simulated--(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A). That language is essentially identical to the language found in paragraph 6 of the Superseding Indictment. Count 7 charges Mr. Christie with violating §

2252A(a)(2), which prohibits the knowing receipt or distribution of any child pornography or any material containing child pornography "that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer."   18 U.S.C. § 2252A(a)(2)(A), (B).  Similarly, Count 8 charges Mr. Christie with violating  § 2252A(a)(5)(B), which prohibits the knowing possession of "any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer."  Thus, read as a whole, the Superseding Indictment, in Counts 7 and 8, sufficiently apprise Mr. Christie that he is charged with knowingly receiving and attempting to receive child pornography as defined in § 2256(8)(A) and/or (C).  The law does not require a more detailed statement to put Mr. Christie on notice of the crime with which he is charged.

> **D.    Even if some of the images described in the affidavit, standing alone, would not have provided probable cause for the warrant, there was ample other evidence to support such probable cause.**

In Part III of his supplemental brief, Mr. Christie asserts that some of the images referenced in the warrant affidavit constitute "a-typical, 'legal' child erotica photographed in a studio setting, most likely by a professional photographer."  (Christie Supp. Br. at 8.)  Specifically, Mr. Christie directs the Court's attention to page 15 of the warrant affidavit, on which Mr. Christie is attributed with posting about 32 images, all depicting the same 10-year-old girl.  The affidavit describes some of the photos as depicting the girl "facing the camera in the process of removing her pink and black top and exposing her breasts."  (Warrant Aff. at ¶ 23(b).)  Other photos depict the girl "bending over exposing her buttocks and . . . in the process of

removing her shorts," and still others show the girl "fully nude exposing her breasts and vagina."

(*Id.*)  Again, Mr. Christie insists that these images are "legal child erotica," which has been

defined as "innocent pictures of children, arousing only in the minds of certain viewers."  *United*

*States v. Williams*, 444 F.3d 1286, 1304 (11th Cir. 2006), *rev'd on other grounds*, 128 S. Ct.

1830 (2008); *see also United States v. Gourde*, 440 F.3d 1065, 1068 (9th Cir. 2006) (explaining

child erotica as "images that are not themselves child pornography but still fuel [one's] sexual

fantasies involving children").  In other words, Mr. Christie seems to be arguing that while some

might find it incredibly disturbing that he would be aroused by arguably innocent photos of

children, those photos cannot constitute the probable cause necessary for the issuance of a search

warrant if they do not meet the statutory definition of child pornography, i.e., sexually explicit

conduct, such as sexual intercourse or "lascivious exhibition of the genitals or pubic area."[18]  *See*

18 U.S.C. § 2256(2)(A).

Mr. Christie might have had a legitimate argument regarding these images if they were

the sole basis upon which the warrant was based.  But they most decidedly are not the only

images.  Quite the contrary, Mr. Christie conveniently omits the fact that the affidavit provided

the following detailed description of one of the videos he is alleged to have posted a link to on

NAMGLA:

---

[18] To the extent that Mr. Christie is arguing that he cannot be prosecuted for possessing such photos, it is not at all clear that he is being prosecuted for those photos.  But even if he is, it is the Government's burden to prove that such photos constitute child pornography as defined in the statutes and explicated in the instructions that this Court will give to the jury.  *See, e.g., United States v. Villard*, 700 F. Supp. 803, 808 (D.N.J. 1988) (quoting jury instruction that declared that determination of whether an image depicts sexually explicit conduct "will have to be made based upon the overall content of the visual depiction, taking into account the age of the minor, the combined effect of the setting, attire, pose and if emphasis on the genitals is designed to elicit a sexual response in the viewer").

> The movie file, which is approximately 18 minutes and 52 seconds, depicts a fully nude prepubescent brown-haired female . . . . Throughout the video, the camera zooms in and out of the female's genitalia . . . . [An] adult female's hands are seen spreading open and posing the minor female's legs . . . . [An] adult male is holding his penis and rubbing it against the prepubescent female's vagina. During this time, the adult female is holding the prepubescent female's legs and exposing her vagina and anus . . . as the adult male masturbates and ejaculates onto the prepubescent female's vagina. . . . [Later], the male inserts his penis into the girl's mouth before pulling it out and ejaculating into her mouth.

(Warrant Aff. ¶ 22(c).)  Based upon this description alone, there is no doubt that Magistrate Judge Shwartz had probable cause to issue the search warrant for Mr. Christie's home.  But the probable cause was based upon more than just that one video, including the extensive description of the FBI's investigation of NAMGLA, its contents, and the multiple postings of Mr. Christie to that website.  In sum, the images Mr. Christie deems "legal child erotica" do not prevent a finding of probable cause to search his home, given the additional bases available.  *See United States v. Hansel*, 524 F.3d 841, 846 (8th Cir. 2008) (rejecting defendant's argument that child erotica mentioned in warrant affidavit prevented finding of probable cause, and instead holding that the totality of the circumstances supported such probable cause).[19]

---

[19] Consistent with the theme of Mr. Christie's handwritten brief, the cases he cites in support of his argument on this point are wholly inapplicable to the facts of this case.  For example, the language he quotes from *Villard*, 700 F. Supp. at 808, comes from the court's jury instructions and is irrelevant to the pretrial issues presently before this Court.  Similarly, *Doe v. Chamberlin*, 139 F. Supp. 2d 637, 645 (M.D. Pa. 2001), *aff'd*, 299 F.3d 192 (3d Cir. 2002), is useless inasmuch as it was a civil action in which the court granted summary judgment after concluding that no reasonable juror could conclude that the images met the statutory definition of lascivious display of the pubic area.  This Court is not in a position to make a similar summary judgment-type decision in this criminal case.

**E.      The Magistrate Judge was not required to view the actual images of alleged child pornography before finding probable cause to issue the warrant.**

Mr. Christie also argues that the search warrant lacked probable cause because "noware [sic] is there mention of Magistrate Judge Schwartz [sic] being provided with sample copys [sic] of images."  (Christie Supp. Br. at 10.)  But Mr. Christie fails to understand the caselaw he cites, which clearly states that a magistrate judge is not required to actually view the images that are alleged to be child pornography before she can find probable cause to issue a warrant.  Instead, she need only review a factual description of the images by law enforcement.  *New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 n.5 (1986) ("[W]e have never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure.  On the contrary, we think that a reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene, and whether a warrant authorizing the seizure of the film should issue.") (internal citation omitted).  The cases Mr. Christie cites are not to the contrary.[20]

---

[20] *See, e.g.*, *United States v. Battershell*, 457 F.3d 1048, 1053 (9th Cir. 2006) ("[F]ailing to include a photograph in a warrant application is not fatal to establishing probable cause. Indeed, a judge may properly issue a warrant based on factual descriptions of an image."); *United States v. Brunette*, 256 F.3d 14, 18 (1st Cir. 2001) ("A judge cannot ordinarily make this [probable cause] determination without either a look at the allegedly pornographic images, or *at least an assessment based on a detailed, factual description of them*.") (emphasis added); *United States v. Vigeant*, 176 F.3d 565, 571 (1st Cir. 1999) (finding no probable cause where affidavit contained mere conclusions without factual descriptions to support such conclusions); *United States v. Smith*, 795 F.2d 841, 847 (9th Cir. 1986) (noting, in child pornography case, that the court was "troubled" by the fact that photos were not shown to the magistrate judge, but concluding that "[n]evertheless, we do not find this omission fatal to the warrant in light of the affidavit taken as a whole").

### F.      Miscellany

#### (1)      The jury will resolve the factual disputes raised by Mr. Christie.

On pages 10 through 16, Mr. Christie makes various arguments that essentially amount to a factual refutation of the charges against him.  In other words, he has used these pages of his brief to lay out his affirmative defenses.  In that regard, this is not the proper time or place to advance such arguments.  Mr. Christie will have ample opportunity to stand before a jury of his peers and explain to them how he either did not do what is alleged by the Government, or that, having done what is alleged, it does not amount to criminal conduct.  A jury will resolve these issues, not the Court at this time.


#### (2)      Law enforcement did not exceed the scope of the warrant.

In Part IX, on page 17 of Mr. Christie's supplemental brief, he argues that the executing officers exceeded the scope of the warrant when they (1) sought to open a "steel fire safe" in Mr. Christie's home; and (2) opened his "unopened mail."  Specifically, Mr. Christie complains that "[n]othing in the safe was on the search warrant list of things to be search [sic] for or seized." (Christie Supp. Br. at 17.)  While it might be true that nothing that the officers could have seized pursuant to the warrant was actually located in the safe, that does not mean that the officers exceeded the scope of the warrant simply by looking in the safe for such items.  Mr. Christie's argument seems to suggest that if the officers look under the cushions of the couch and do not find child pornography, then they have exceeded the scope of the warrant.  That is plainly not the law.  It is more than conceivable that the safe could have contained any number of the items authorized to be seized, e.g., correspondence, records, electronic equipment.  Similarly, Mr.

56

Christie's argument as to the unopened mail also fails because that is clearly "correspondence or records" and thus fell within the scope of the search warrant.[21]

Somewhat relatedly, Mr. Christie asserts that "[i]n 2006, a three-judge panal [sic] of the New Jersey State Appeals Court unanimously decided in favor of 'Expectation of Internet Privacy.'" (Christie Supp. Br. at 17.)  Mr. Christie attaches a newspaper article about the ruling, and then advises this Court that he "wish[es] to partition [sic] certiorari to have this issue reviewed and decided on a federal level."  (*Id.*)  While this Court is somewhat bewildered as to what the above statement means, the Court has identified the case to which Mr. Christie's newspaper article refers, *State v. Reid*, 389 N.J. Super. 563 (App. Div. 2007).  This Court will construe his odd "wish" as an argument that he has a legitimate expectation of privacy in his Internet subscriber information such that the Government violated the Fourth Amendment by learning, absent a warrant or other appropriate procedures, the identity of the person utilizing the IP address associated with the anonymous online name of "franklee."

It is true that the Appellate Division of the Superior Court of New Jersey held, in *Reid*, that New Jersey citizens have "an expectation of privacy under [the] State Constitution with

---

[21] Mr. Christie's citation to *United States v. Goodwin*, 674 F. Supp. 1211 (E.D. Va. 1987) is an especially egregious example either of Mr. Christie's failure to understand caselaw and apply it to the facts at hand, or his willful attempt to mislead this Court as to the applicable law. In his brief, he quotes *Goodwin* as holding that "police must get a warrant to open mail." (Christie Supp. Br. at 17 (quoting *Goodwin*, 674 F. Supp. at 1214).)  But the language he quotes comes from a letter from an advertiser of child pornography that the Court quoted for a wholly unrelated reason.  In other words, it is not the language of the *Goodwin* court, even if it is the law.  Moreover, the officers in this case did have a warrant to open his mail because the warrant authorized them to search and seize "correspondence" found in Mr. Christie's home.

If this specious quotation and argument had been advanced by an attorney, that individual would be met with much more dire consequences from this Court.  As it is, Mr. Christie is admonished to not waste judicial resources with such frivolous arguments based on misleading quotations from caselaw.

respect to this identifying information" associated with an IP address.  *Reid*, 389 N.J. Super. at

566.  But the Appellate Division expressly noted that federal courts have "uniformly" held that

"internet subscribers have no right of privacy under the Fourth Amendment with respect to

identifying information on file with their internet service providers."  *Id*. at 569.  More

importantly, the Supreme Court of New Jersey subsequently affirmed the Appellate Division, and

also noted that "[f]ederal case law interpreting the Fourth Amendment has found no expectation

of privacy in Internet subscriber information . . . [and] [t]he logic of those precedents extends to

subscriber information revealed to an I[nternet] S[ervice] P[rovider]."  *State v. Reid*, 194 N.J.

386, 396 (2008) (citing *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001); *Freedman v. America*

*Online, Inc.*, 412 F. Supp. 2d 174, 181 (D. Conn. 2005); *United States v. Sherr*, 400 F. Supp. 2d

843, 848 (D. Md. 2005); *United States v. Cox*, 190 F. Supp. 2d 330, 332 (N.D.N.Y. 2002);

*United States v. Kennedy*, 81 F. Supp. 2d 1103, 1110 (D. Kan. 2000); *United States v. Hambrick*,

55 F. Supp. 2d 504, 508-09 (W.D. Va. 1999), *aff'd*, 225 F.3d 656 (4th Cir. 2000); *Smith v.*

*Maryland*, 442 U.S. 735, 742 (1979) (finding no privacy interest in telephone numbers dialed);

*United States v. Miller*, 425 U.S. 435, 442 (1976) (finding no privacy interest in bank records)).

This federal Court declines to ignore the unanimous decision of every other federal court to have

addressed this issue by adopting the more expansive interpretation of the Supreme Court of New

Jersey, which, on its face, distinguishes the protection afforded under the state constitution from

that of the federal Constitution.  Therefore, this Court holds that Mr. Christie does not have a

legitimate expectation of privacy in the information associated with his IP address.

**(3)** **The prosecution of Mr. Christie under 18 U.S.C. § 2251(d)(1)(A) is not facially improper or mistaken.**

Next, Mr. Christie argues that he should not be prosecuted under 18 U.S.C. § 2251(d)(1)(A) because, "put simply, [that statute] is designed to punish a would-be producer/manufacturer who advertises his or her own created child pornography for sale or barter."[22]  (Christie Supp. Br. at 18.)  Furthermore, according to Mr. Christie, "it is unrealistic to believe Congress intended to punish an individual who merely posts an Internet link with a mandatory minimum sentence of no less than (15) years."  (*Id*.)  Mr. Christie is fundamentally mistaken in his reading of the statute.  There is nothing in § 2251 that even suggests, much less requires, a "sale or barter" element.  Furthermore, the subsection under which he is charged does not require that he be involved in the production of the illegal images.  It is worth quoting the language again:

> Any person who, in a circumstance described in paragraph (2), knowingly makes, prints, or publishes, or causes to be made, printed, or published, any notice or advertisement seeking or offering--
>> (A)      to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; or
>> (B)      participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct:
> shall be punished as provided under subsection (e).

18 U.S.C. § 2251(d)(1).  Again, Mr. Christie is not charged with violating § 2251(d)(1)(B), but instead is charged with publishing a notice or advertisement seeking or offering such already-produced illegal images.

---

[22] Mr. Christie is charged with six counts of violating  § 2251(d)(1)(A).

59

To the extent that Mr. Christie finds support for his argument in the language of "in a circumstance described in paragraph (2)," he is again wrong.  That reference is to § 2251(d)(2), which declares:

> The circumstance referred to in paragraph (1) is that--
> (A)  such person knows or has reason to know that such notice or advertisement will be transported in interstate or foreign commerce by any means including by computer or mailed; or
> (B)  such notice or advertisement is transported in interstate or foreign commerce by any means including by computer or mailed.

18 U.S.C. § 2251(d)(2).  In other words, paragraph (2) is simply the typical interstate commerce element that is required in such a statute addressing this type of conduct.  In sum, § 2251(d)(1)(A) "criminalizes behavior that knowingly makes or causes to be made any notice offering to distribute or reproduce child pornography across state lines."  *United States v. Sewell*, 513 F.3d 820, 821-22 (8th Cir. 2008) (internal quotation marks omitted).

Mr. Christie's arguments to the contrary are unsupported in the law he cites or elsewhere.  Indeed, as to his assertion that Congress could not have intended such a harsh sentence, the Third Circuit has observed otherwise.  In *United States v. Goff*, 501 F.3d 250 (3d Cir. 2007), the court quoted legislative history from the Child Pornography Prevention Act of 1996, which noted that "the existence of a traffic in child pornographic images . . . increas[es] the creation and distribution of child pornography . . . ," and "prohibiting the possession and viewing of child pornography will . . . eliminate the market."  *Id*. at 260; *see also United States v. MacEwan*, 445 F.3d 237, 250 (3d Cir. 2006) ("Congress found little distinction in the harm caused by a pedophile, be he a *distributor or mere consumer* in child pornography, because the mere

'existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.'") (quoting Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009).  Thus, it is clear that imposing a mandatory fifteen-year minimum sentence for someone who traffics, or attempts to traffic, in child pornography, as Mr. Christie is charged with doing, serves the congressional intent of attempting to eliminate that insidious market.[23]

Finally, Mr. Christie makes a weak argument with regard to the "expiration of the search warrant" and the "defective indictment."  (*See* Christie Supp. Br. at 19.)  The Court rejects such arguments on both fronts as void of any merit.

## VII.   Admonition

Last, but not least, this Court, having thoroughly reviewed his independent brief and the arguments contained within, feels compelled to advise Mr. Christie that he would serve himself well if he were to allow his attorneys to utilize their expertise in defending him in this matter. The Office of the Federal Public Defender has an excellent reputation in this District, and Ms. Gauli-Rufo and Mr. Yauch are attorneys of the highest caliber within that Office.  This Court has had the privilege of having these attorneys appear before the Court on countless occasions, and

---

[23] The Court notes again a serious error in the application of case law by Mr. Christie.  He quoted the following language from an Eleventh Circuit decision: "Thus, the non-commercial, non-inciteful promotion of illegal child pornography, even if repugnant, is protected speech under the First Amendment."  *United States v. Williams*, 444 F.3d 1286, 1298 (11th Cir. 2006). But Mr. Christie once again neglects to mention the rather important fact that the Supreme Court has since reversed that case.  Not only did the Supreme Court reverse the decision, it actually reversed the very language that Mr. Christie quoted from the Eleventh Circuit's opinion.  *See United States v. Williams*, 128 S. Ct. 1830, 1842 (2008).  Moreover, *Williams* is not even applicable to the argument Mr. Christie makes with regard to § 2251.

they have always comported themselves in the most professional and admirable fashion, resulting in the sterling reputation they deserve.

To the extent that they might have advised Mr. Christie not to make many of the arguments he has now made, the Court suggests that Mr. Christie reevaluate his reluctance to trust the counsel of these fine attorneys.  Indeed, nary a case cited by Mr. Christie in his independent motions supported the argument he tried to make.  Furthermore, some of the cases have since been overruled, and many of the quotations he found persuasive were in fact from dissents.  In sum, his attempt at self-representation has proven woeful.  Again, the Court implores Mr. Christie to acknowledge the expertise of his attorneys, given that they have been involved with innumerable criminal cases, and as a consequence have a wealth of experience that Mr. Christie would do well to rely upon going forward.

**VIII.   Conclusion & Order**

For the foregoing reasons, Defendant's motions (Doc. Nos. 39 and 47) are hereby DENIED.

Dated: August 13, 2008
Newark, New Jersey

<u>/s/ Harold A. Ackerman</u>
U.S.D.J.